UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

CHARLES E. GETCH,                    )
          Plaintiff,                 )
                                     )
     v.                              )          CAUSE NO.: 2:06-CV-143-PRC
                                     )
JO ANNE B. BARNHART,                 )
Commissioner of the Social Security  )
Administration,                      )
          Defendant.                 )

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Charles Getch ("Getch") on April 12, 2006, and a Motion for Summary Judgment [DE 11], filed by Getch on August 7, 2006. Getch seeks judicial review of a final decision of the Defendant, the Commissioner of the Social Security Administration ("the Commissioner"), in which he was denied Disability Insurance Benefits ("DIB") under Sections 216(i) and 223 of Title II of the Social Security Act. For the following reasons, the Court denies Getch's request to reverse and remand the decision of the Commissioner.

## PROCEDURAL BACKGROUND

On December 10, 2002, Getch applied to the Social Security Administration for DIB, alleging a disability onset date of January 6, 2000. Getch alleged that his disability resulted from depression, a separated sternum, high cholesterol, high blood pressure, gout, and obesity. Getch's application was denied initially on February 7, 2003, and again on June 12, 2003, upon reconsideration. On July 14, 2003, Getch filed a timely request for a hearing before an Administrative Law Judge ("ALJ"). On August 19, 2004, ALJ Bryan Bernstein presided over the

hearing in Merrillville, Indiana. Getch appeared with counsel and testified. Thomas Grzesik, a Vocational Expert ("VE"), also appeared and testified. ALJ Bernstein issued his decision on September 8, 2005, finding that Getch's impairments did not render him "disabled" as defined by the Act. The ALJ found that Getch was capable of performing his past relevant work.

On October 10, 2005, Getch submitted additional evidence and requested that the Social Security Administration Appeals Council review ALJ Bernstein's decision. On February 17, 2006, the Appeals Council denied Getch's request for review, thereby rendering ALJ Bernstein's decision the final decision of the Commissioner. Getch filed a timely Complaint with this Court on April 12, 2006, seeking judicial review. On August 7, 2006, Getch filed a Plaintiff's Memorandum in Support of His Motion for Summary Judgment. On October 23, 2006, the Commissioner filed a Memorandum in Support of the Commissioner's Decision. On November 2, 2006, Getch filed a Reply Brief.

On May 3, 2006, the parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636 and 42 U.S.C. § 405(g).

## FACTS

### A. Background

Charles Getch was born on December 13, 1949, and was 54 years old at the time of his Social Security hearing. He is approximately 6'3" tall and weighs more than 300 pounds. Getch is a single father of three children. Getch has a high school diploma and completed several years of

college education.  Getch's past work experience includes employment as a seam welder, x-ray technician, and store manager.  The ALJ found that Getch has not engaged in substantial gainful activity since his alleged onset of disability.

### B. Medical Evidence

Getch presented to South Suburban Hospital on May 18, 1998, with chest pain.  An echocardiogram performed in the emergency room showed evidence of ischemia, a restriction in blood supply.  Getch underwent immediate cardiac catheterization, which revealed blockages in his left main, left anterior descending, and right coronary arteries.  Getch was immediately transferred to St. Francis Hospital for emergency bypass surgery.  On May 18, 1998, Getch underwent triple bypass surgery.  On May 25, 1998, Getch was discharged.  Getch's recovery progressed moderately slowly.  On August 2, 1998, Getch requested a note to return to regular duty work from his doctor.

Over a year later, on December 21, 1999, a CT scan of Getch's thorax revealed a separated sternum.  Getch's sternum apparently did not fully heal after it was separated by doctors to allow access to perform bypass surgery.  There was approximately a 1 cm separation between the sternal fragments and slight anterior displacement of the left lateral fragment, in relation to the right lateral fragment.

On January 21, 2000, Getch saw Dr. Looyenga at South Suburban Hospital due to continued sternal pain and complained of a grinding sensation in his chest.  Getch noted that the pain radiated slightly to the right of the midline.  Getch received costochondral injections to control the pain.  For more than a month following his last injection, Getch reported fairly good pain control with moderate improvement.  Dr. Looyenga administered a third injection, and Getch tolerated the procedure quite well.

On March 21, 2000, Getch was readmitted to St. Francis Hospital complaining of chest pain. Getch reported that he was doing some lifting at work and heard a sudden snap, which turned out to be the fracturing of his sternum. Robert G. Kummerer, M.D., reported that Getch "resumed vigorous activity too early in his postoperative course and developed an instability of his sternum and an epigastric hernia." R. at 86. Following evaluation, surgeons determined that Getch's fracture required surgical repair. On March 21, 2000, Getch underwent surgery to repair the sternal fracture. Treating physicians reported that Getch tolerated the procedure well and his post-operative case was uncomplicated.

On July 14, 2000, a CT scan of Getch's sternum revealed a midline sternotomy[1] with six sternal wires present. The wires appeared intact and there was no definite evidence of bone destruction or apparent inflamation of the bone.

On October 11, 2000, still suffering from sternum pain, Getch sought pain management services at South Suburban Hospital. Nicholas Angelopoulos, D.O., initially evaluated Getch's complaints of middle and upper sternum pain. Getch explained that he previously underwent surgery to repair his sternum, but the pain never resolved completely. He indicated that coughing, sneezing, and deep breathing exacerbated his chest pain. He rated his pain during the day at a 2 or 3 out of 10, with 10 representing extreme pain. Getch described a grinding and popping sensation in his chest. He stated that he had difficulty sleeping. Getch stated that he obtained some pain relief through the use of Neurontin, but that it caused an unacceptable level of sedation.

On physical examination, Dr. Angelopoulos reported that Getch was moderately obese, his lungs were clear, and his heart had a regular rate and rhythm. He noted that Getch had tenderness

---

[1]"Sternotomy" is defined as "[i]ncision into or through the sternum." Stedman's Medical Dictionary 1836 (28th ed. 2006).

4

over the upper third of his sternum, although he was unable to feel a gap in the sternum.  Dr. Angelopoulos assessed that Getch had a "[n]on-healing sternal fracture involving the upper third of the sternum with chronic mid sternal chest pain noted by x-ray to be a 5 to 6 mm gap in the sternum at the level of the first and second wires."  R. at 134.  Dr. Angelopoulos reported that the range of motion of Getch's upper and lower extremities was normal.  Neurologically, Getch's motor strength and sensory function were grossly intact.  Dr. Angelopoulos prescribed Celebrex, a nonsteroidal anti-inflammatory drug, and indicated that he would give Getch a cortisone injection to the sternal gap, and would provide follow-up treatment.

On October 25, 2000, on a visit with Dr. Looyenga at South Suburban Hospital, Getch reported some improvement from the use of Celebrex.  Dr. Looyenga administered a steroid injection to Getch's anterior chest wall and sternum.  Under fluoroscopy, Dr. Looyenga saw that the first and second sternotomy wires were broken and that there was a gap in the upper sternum.

On November 13, 2000, Getch underwent a cardiac graded exercise stress test.  No problems were noted during his 16 exercise sessions.  Getch exited the program due to sternal separation and indicated that he was scheduled to receive cortisone shots.

On November 15, 2000, Getch saw Dr. Angelopoulos at South Suburban Hospital and reported that the cortisone injection helped for a short period of time.  Getch stated that his chest pain was not as bad as it was before the injection.  Getch reported that he continued to have pain, especially when he was in the supine position.  Dr. Angelopoulos administered another injection.

On June 15, 2001, under the supervision of Dr. Looyenga, Getch underwent another cardiac graded exercise stress test and exercised for 8 minutes and 6 seconds.  Getch achieved 84% of maximum predicted heart rate at 142 beats per minute.  Getch's blood pressure was mildly

hypertensive.  Getch denied any chest pain and his EKG was within normal limits.  Dr. Looyenga cleared Getch to proceed with cardiac rehab.

On January 8, 2001, Getch underwent another CT chest scan, which revealed post operative changes to the surgical wire loops in Getch's sternum.  A wire loop in the upper sternum was fractured, but no bony destruction was seen.

On November 1, 2001, Getch saw Alexander Geha, M.D., Chief of Cardiothoracic Surgery at the University of Illinois at Chicago.  On physical examination, Dr. Geha reported that Getch's lungs were clear and his heart sounds were normal.  He noted that Getch exhibited some evidence of discomfort upon pressure of the midsternotomy area, with some instability of the sternum on pressure.  Dr. Geha reviewed three sets of CT scans and stated that all showed "evidence of malunion of the sternal fragments despite the fact that the wires themselves were intact and did not show evidence of breaking."  R. at 121.  Dr. Geha opined, "I doubt that it is going to be likely that another operation will succeed in achieving healing of the sternal fragments, in view of the fact that these have gone for a long time with a malunion."  *Id*.  Dr. Geha further opined, "I believe that proper conditioning may be successful in returning the patient to a reasonable level of activity."  *Id*. Dr. Geha stated, "I think it would not be realistically possible for him to go back to a type of work that entails real heavy lifting and lifting of heavy weights in view of this recurrent problem with his sternum. . . . My advice, therefore, is to have him switch to a type of job that avoids extremely heavy and strenuous activity and pulling on the upper extremities."  *Id*. at 121-22.

In a letter dated January 15, 2002, Dr. Looyenga wrote to Jerome Daly, D.O., another treating physician.  Dr. Looyenga wrote that Getch was unemployed because of the strict limitations of limited weight lifting and that Getch had a high cholesterol reading in a recent blood test.  Dr.

6

Looyenga opined that due to his young age and history of bypass surgery that Getch should initiate statin therapy for his high cholesterol.  Dr. Looyenga instructed Getch to follow-up with Dr. Daly in six weeks.  A May 16, 2002, follow-up report from the Heart Care Centers of Illinois noted that Getch was "doing quite well."  R. at 145.

On January 8, 2003, Suresh Mahawar, M.D., performed a 40 minute examination of Getch at the request of the State Agency.  Getch indicated that he had been diagnosed with gout,[2] and he described his pain as throbbing and tender to the touch, and that he had it most of the time.  Getch stated that he had pain only when his gout flared up and that he was experiencing gout every other month because he stopped taking medication due to side effects.  Getch reported that he suffered from chest pain since 1999.  Getch indicated that sternal cortisone injections helped with his chest pain.

On physical examination, Dr. Mahawar reported that Getch's chest revealed no deformity and his heart had a regular rate and rhythm.  Range of motion testing was within normal limits. There was no significant tenderness or muscle spasm.  Getch's motor strength in his extremities was full at 5/5, and his ability to perform gross and fine manipulations was normal.  Getch's station was stable and he walked with a mild limp without ambulatory assistance.

On January 8, 2003, Irena Walters, Psy.D., conducted a mental status evaluation of Getch at the request of the State Agency.  On evaluation, Getch reported fleeting thoughts of suicide, but denied any plans or intent.  Getch reported that he felt helpless and hopeless.  He indicated that he did not sleep well because he bounced around all night feeling uncomfortable.  He admitted to

---

[2]"Gout" is defined as "[a] disorder of purine metabolism, occurring especially in men, characterized by a raised but variable blood uric acid level and severe recurrent acute arthritis of sudden onset resulting from deposition of crystals of sodium urate in connective tissues and articular cartilage; most cases are inherited, resulting from a variety of abnormalities of purine metabolism."  Stedman's Medical Dictionary 827 (28th ed. 2006).

frequent feelings of anxiety. He stated that he constantly worried about the future. Dr. Walters assigned Getch a Global Assessment of Functioning ("GAF") score of 55 out of a possible 100 and diagnosed him with depressive disorder and generalized anxiety disorder.

F. Kladder, Ph.D., a State Agency psychologist, reviewed the evidence of record on January 21, 2003, and opined that Getch did not have a severe mental impairment. On May 23, 2003, D. Unversaw, Ph.D., also a State Agency psychologist, reviewed the evidence of record and concurred with Dr. Kladder's opinion.

On January 25, 2003, W. Bastnagel, M.D., a State Agency physician, reviewed the evidence of record and opined that Getch could occasionally lift and/or carry 20 pounds and 10 pounds frequently; could stand and/or walk about 6 hours in an 8-hour workday; and could sit about 6 hours in an 8-hour workday. Dr. Bastnagel also opined that Getch could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but never climb ladders, ropes, or scaffolds. Dr. Bastnagel further opined that Getch should avoid concentrated exposure to extreme heat and cold. On May 27, 2003, A. Landwehr, M.D., another State Agency physician, reviewed the evidence of record and concurred with Dr. Bastnagel's opinion.

On November 6, 2003, Getch saw Dr. Daly and reported chest discomfort. In a letter dated November 18, 2003, Dr. Daly stated that Getch was "disabled at present" secondary to coronary artery disease, status-post bypass surgery, and non-union of his sternum. R. at 208. He also reported that Getch had gout, which was very painful most of the time, and that the non-union of Getch's chest caused Getch constant pain. In addition, Dr. Daly stated that Getch had severe hypertension and suffered from situational anxiety and depression.

On November 28, 2003, Dr. Looyenga completed a Cardiac Residual Functional Capacity Questionnaire in regards to Getch.  In the form, he opined that Getch had coronary artery disease and hypertension and identified Getch's symptoms as chest pain, anginal equivalent pain, shortness of breath, and fatigue.  Dr. Looyenga opined that Getch was not a malingerer, displayed marked limitations of physical activity, and was incapable of even "low stress" jobs. R. at 210-11, 214.  He also opined that Getch's cardiac symptoms were severe enough to frequently interfere with the attention and concentration needed to perform even simple work tasks. Dr. Looyenga further opined that Getch could only walk one city block without rest or severe pain, could only walk less than 2 hours during an 8-hour workday, and could only sit about 4 hours during an 8-hour workday.  He indicated that Getch could rarely lift less than 10 pounds and never lift anything over 10 pounds. Dr. Looyenga stated that Getch could never twist, stoop, crouch/squat, and climb.  He opined that Getch was a Class IV cardiac patient who had symptoms at rest and whose ordinary activity should be markedly restricted.

On September 24, 2004, R. Rashan, M.D., performed a physical examination of Getch at the request of the State Agency.  Getch reported that his sternum was very painful and felt as though something was sitting on his chest.  Getch stated that he would not lift more than 5 pounds.  Getch reported that if he turned in his sleep, his bones would grind together and wake him.  Getch indicated that gout affected all his joints.

On physical examination, Dr. Rashan noted that Getch was 324 pounds, walked with a normal gait, was able to walk heel to toe, and was able to tandem walk.  No ambulatory aides were needed.  Dr. Rashan also noted that Getch was able to stoop and fully squat.  Getch was able to get on and off the examination table without assistance.  Getch's lungs were clear and his heart had a

regular rate and rhythm.  Dr. Rashan indicated that there was no evidence of crepitation, tenderness, or swelling in Getch's feet or ankles, and there were no signs of poor circulation.  Dr. Rashan identified a decreased range of motion at the elbow.  Getch's hips revealed no evidence of tenderness or atrophy.  Dr. Rashan identified no anatomical abnormalities of Getch's cervical, thoracic, and dorsolumbar spine, and the range of motion of Getch's back was full.  Getch's muscle strength was full at 5/5.  Getch's grip strength was also full with good fine manipulation.  Dr. Rashan stated that Getch's mental status was normal.  Dr. Rashan conducted a treadmill graded exercise tolerance ECG of Getch and noted no ischemic changes, as Getch exercised to 5 METS for 9 minutes and 7 METS for 4 minutes.[3]

Dr. Rashan opined in a written report that Getch could lift and/or carry less than 10 pounds frequently or occasionally; could stand and/or walk for less than 2 hours in an 8-hour workday; and could sit for less than 6 hours in an 8-hour workday.  He also opined that Getch was limited in pushing and/or pulling with his extremities, but he did not specify to what extent.  He further opined that Getch could never climb, balance, kneel, crouch, crawl, or stoop due to pain in Getch's upper and lower extremities and that Getch could occasionally reach in all directions, including overhead, and could occasionally perform gross manipulations.

In a letter dated January 3, 2005, Dr. Looyenga reported to the ALJ that Getch had done relatively well from a cardiac standpoint.  He noted that Getch's last stress test showed no evidence

---

[3]METS are multiples of the patient's resting metabolic activity. The New York Heart Association states that people who achieve an exercise level of 7 METS or higher are not limited in their physical activities by cardiac disease. *See* Edward K. Chung, M.D., *Exercise Electrocardiography* 66 (2d ed.1983); *Simpson v. Apfel*, 215 F.3d 1330, *1 (7th Cir. 2000).

of ischemia. Dr. Looyenga opined that due to Getch's "sternal separation he is unable to perform much weight lifting over 10-15 pounds." R. at 233.

### C.  Plaintiff's Testimony

At the administrative hearing, held on August 19, 2004, Getch testified that his chest hurt and had a grinding sensation. He stated that he had shortness of breath and that a grinding sensation resulted when he tried to sleep or move around in bed at night. Getch reported that he was constantly tired and recently gained "a lot of weight." R. at 317. Getch testified that his doctors stated that his chest was separated about an inch, and that the condition was termed a non-union sternum. Getch testified that his doctor advised him not to lift more than 5 to 10 pounds.

Getch explained that after his first bypass surgery, his sternum broke. Getch stated that doctors performed reconstructive surgery, but it never healed. Getch testified that the wires around the sternum were broken and that the doctors felt it could not be repaired since it failed to heal after two previous surgeries. Getch explained that the only other option was to remove the sternum which the doctors opined was too dangerous.

Getch testified that he also experienced painful angina and had high blood pressure, which doctors opined caused his heart disease. Getch said he was diagnosed with gout and prescribed steroids to reduce the inflammation. Getch testified that he had swelling in his feet and joints and stated that "my feet are always constantly sore, I got swollen joints in my fingers, my elbows are inflamed . . . I can barely walk because of it at times." R. at 316.

Getch also testified that he felt depressed. Getch stated that his oldest son would drive him around and that all three of his children helped around the house so that he did not have to do any household activities, which irritated his sternum.

11

Getch testified that before his injuries, he worked as a seam welder.  His duties involved watching a screen that showed whether the machine was making a proper weld.  The job required sitting with the option to stand at times and required that he lift 5 to 10 pounds.  Getch testified that the conditions of his job exposed him to hot temperatures, smoke, and fumes from the welding. Getch stated that the atmosphere caused him to cough.  Getch stated that there was no heating or air-conditioning in the plant, and when it was hot outside it was "extra-hot" inside.  R. at 322.  Getch testified that it was also extremely cold at times, which made his chest feel worse.

### D.  The Vocational Expert's Testimony

VE Thomas Grzesik testified that Getch's past relevant work required skills compatible with lifting 10 to 20 pounds and sitting and standing 50 percent or more of the time.  Mr. Grzesik stated that the seam welder job, as it was performed elsewhere, was characterized as light work with standing at times.  Mr. Grzesik stated that sometimes a worker would need to stand for more than 50 percent of the workday.  Mr. Grzesik testified that there would be days when the individual would not have an option to sit.  Mr. Grzesik stated that there were no transferable skills from the seam welder job.  Mr. Grzesik testified that machine tender is the generic name for the seam welder job.  Mr. Grzesik estimated that about half the work of a machine tender involves exposure to the elements.

### E.  Decision of Administrative Law Judge

In a decision dated September 8, 2005, ALJ Bernstein made the following findings:

1.      The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.

2.      The claimant has not engaged in substantial gainful activity through the date of this decision.

3.      The claimant's coronary artery disease and residuals from a fractured sternum are "severe" impairments, based upon the requirements in the Regulations (20 CFR § 404.1250(c)).

4.      This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.      The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.      The claimant has the following residual functional capacity: lift and/or carry 20 pounds occasionally and 10 pounds frequently.  He must alternate sitting and standing, with a total time seated of more than 50 percent of an 8 hour work day secondary to some fatigue and shortness of breath with heavier exertion.

7.      The claimant's past relevant work as seam welder machine tender did not require the performance of work-related activities precluded by his residual functional capacity (20 CFR § 404.1565).

8.      The claimant's medically determinable coronary artery disease and residuals from a fractured sternum do not prevent the claimant from performing his past relevant work.

9.      The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(a)(4)(iv), (f)).

R. at 23-24.

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will only reverse if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford*, 227 F.3d at 869; *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ's findings are supported by substantial evidence and under the correct legal standard. *See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). If an error of law is committed by the Commissioner, then the "court must reverse the decision regardless of the volume of evidence supporting the factual findings." *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

An ALJ must articulate, at a minimum, his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55

14

F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). The ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart*, 362 F.3d 995, 995 (quoting *Scott*, 297 F.3d at 595); *see also Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. *See* 42 U.S.C. § 423(d)(1)(A). To be found disabled, the claimant's impairment must not only prevent him from doing his previous work, but considering his age, education, and work experience, it must also prevent him from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. *See* 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(e), (f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4). The steps are:

(1) Is the claimant engaged in substantial gainful activity?  If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to Step 2.

(2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to Step 3.

(3) Does the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to Step 4.

(4) Can the claimant do the claimant's past relevant work?  If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to Step 5.

(5) Can the claimant perform other work given the claimant's residual functional capacity, age, education, and experience?  If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).  At the fourth and fifth steps, the ALJ must consider an assessment of the claimant's RFC. "The RFC is an assessment of what work-related activities the claimant can perform despite [his] limitations."  *Young*, 362 F.3d at 1000.  The ALJ must assess the RFC based on all the relevant evidence of record.  *Id.* at 1001 (citing 20 C.F.R. § 404.1545(a)(1)).  The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ.  *Id.* at 1000; *see also Zurawski*, 245 F.3d at 886; *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

16

Getch argues that the ALJ committed error in the following ways: (1) finding that Getch could perform his past relevant work; (2) failing to find that Getch's gout was a severe impairment; (3) failing to give controlling weight to Getch's treating physicians' opinions and making independent medical findings; (4) failing to properly analyze Getch's credibility; and (5) failing to properly analyze Getch's obesity and failing to consider all conditions in combination.  Getch also argues that the Appeals Council committed an error of law by finding that a treating physician's report of gout was immaterial in establishing a severe impairment.

### A.  Past relevant work

Getch contends that the ALJ erred by finding that Getch could perform his past relevant work as a seam welder.  Step 4 of the ALJ's analysis requires an examination of whether the claimant can do his or her past relevant work.  *See* 20 C.F.R. § 404.1520(a)(4)(iv).  Past relevant work is defined as skills and abilities that the claimant acquired through work done, which show the type of work the claimant may be expected to do.  *See* 20 C.F.R. § 404.1565(a).  The ALJ considers work done in the last fifteen years that lasted long enough for the claimant to learn to do it, and was substantial gainful activity.  *Id*.  The ALJ typically does not consider work done fifteen years or more before the alleged onset date.  *Id*.  An ALJ commits remandable error when he or she fails to fully account for evidence in the record regarding the claimant's limitations so that the decision enables meaningful judicial review.  *See Young*, 362 F.3d at 1002-3.

In determining whether the claimant can return to past relevant work, the ALJ "must ascertain the demands of that work in relation to the claimant's present physical capacities." *Strittmatter*, 729 F.2d at 509.  Pursuant to Social Security Ruling 82-62, the determination of whether an individual can perform past relevant work requires an examination of:

>   (1) the individual's statements as to which past work requirements can no longer be
>   met and the reason(s) for his or her inability to meet those requirements; (2) medical
>   evidence establishing how the impairment limits ability to meet the physical and
>   mental requirements of the work; and (3) in some cases, supplementary or
>   corroborative information from other sources such as employers, the Dictionary of
>   Occupational Titles, etc., on the requirements of the work as generally performed in
>   the economy.

SS Ruling 82-62.  The Ruling also requires the ALJ to set forth the following specific findings of

fact:

>   1. A finding of fact as to the individual's RFC.
>   2. A finding of fact as to the physical and mental demands of the past job/occupation.
>   3. A finding of fact that the individual's RFC would permit a return to his past job or
>   occupation.

*Id*.  If the ALJ finds that the claimant's residual functional capacity does not allow the claimant to

perform his or her past relevant work, the burden shifts to the Agency to show that the claimant is

capable of performing other work that exists in the national economy.  *See Skinner v. Astrue*, No.

05-4094, 2007 WL 677229, *8 (7th Cir. Mar. 7, 2007).

     Here, the ALJ considered three prior occupations held by Getch: seam welder, retail store

manager, and x-ray technician.  At the hearing and in his decision, the ALJ focused on Getch's

ability to return only to the seam welder position.  Getch contends that the ALJ erred in finding that

he could return to work as a seam welder for two primary reasons.  First, Getch contends that the

ALJ erred in equating a machine tender job position to Getch's prior work as a seam welder.  The

ALJ must find the claimant able to do his job "either as the claimant actually performed it or as

generally performed in the national economy."  20 C.F.R. § 404.1560(b)(2).  When analyzing the

claimant's relevant work, analysis of a "similar" job, or the same "type of work," will not do.  *Smith*

*v. Barnhart*, 388 F.3d 251, 253 (7th Cir. 2004).  However, the ALJ may "base his comparison on

the functional demands and job duties of the [claimant's past] occupation as generally required by

18

employers throughout the national economy." *Id.* (citing *Orlando v. Heckler*, 776 F.2d 209, 215-16 (7th Cir. 1985)).

Analyzing Getch's prior employment, the ALJ found the seam welder position to be sedentary and semiskilled.  In his testimony, Getch described his past work as a seam welder as a position where he would sit at a monitor and watch an automated welder weld two pieces of cable together.  Getch stated that he did not have to lift and/or carry anything in excess of 10 pounds and was able to alternate between sitting and standing positions.  Getch was able, if he so elected, to sit more than 50 percent of the time as he performed his job.  Following Getch's testimony, VE Grzesik testified that the seam welder job, as described by Getch, is generally referred to as a machine tender.

Through out the body of his decision, the ALJ referred to Getch's job title as "seam welder." Only in discussing the VE's testimony and in his findings did the ALJ refer to Getch's job as "seam welder machine tender."  But even then, the ALJ used the term "seam welder" as a preface and examined the seam welder duties as testified to by Getch.  As a result, the job title placed on Getch's prior employment did not detract from the ALJ's analysis of the actual job duties as testified to by Getch and analyzed by VE Grzesik.   The ALJ only considered the duties of the job that Getch described in his testimony at the hearing.   Thus, the Court finds that the ALJ substantively considered the correct position.

Second, Getch argues that the ALJ erred in finding that he could physically perform his past relevant work.  Getch states that because approximately half of seam welder jobs are performed in the elements, as VE Grzesik testified at the hearing, Getch's medical conditions did not allow him to work in an environment with such variable temperatures.  Getch points to a report completed by

19

Dr. Rashan, who found that Getch should have limited exposure to noise, dust, vibration, humidity/wetness, hazards, and fumes, odors, chemicals, and gases.  Dr. Rashan also specifically found in the same report that Getch had no exposure limitation to temperature extremes.  Based on Dr. Rashan's report and the rest of the record, the ALJ found that the seam welder job required sustained attention but that there were no activities in the job requirements outside of Getch's residual functional capacity at the time of the hearing.

The Court finds that the ALJ considered the facts contained in the record and the duties of Getch's past relevant work and found that Getch can perform the specific duties of his past seam welder position despite his limitations.  The ALJ did not commit legal error in this finding and his determination is supported by substantial evidence.

### B.  Gout as a severe impairment

Getch next argues that the ALJ erred in failing to find that his gout was a severe impairment. Step 2 of the ALJ's analysis requires an examination of whether the claimant has an impairment or combination of impairments that are severe.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).  A medically determinable impairment or combination of impairments is "severe" if it significantly limits an individual's physical or mental ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).

Gout is one of six conditions that Getch alleged caused his disability.  The ALJ found that Getch's coronary artery disease and residual effects of a fractured sternum were severe impairments but they were not "severe" enough to meet or medically equal the severe impairments listed in Appendix 1, Subpart B, Regulations No. 4.

Considering Getch's gout, the ALJ found that "there is no description by a physician of an actual gout flare-up in the record; his extremities and joints are not swollen, red, or hot, and they do

not have significant loss of range of motion." R. at 16.  The ALJ stated, "[t]he claimant also blames nearly constant leg and foot pain from gout for an inability to walk but the evidence does not support his limited allegations." *Id*.  The ALJ found it persuasive that Getch did not complain of gout pain in October 2002, when he attended a pain management program and saw a pain treatment specialist. The ALJ noted that at some point, Getch took medication to prevent gout flare-ups, and Getch stated that flare-ups occurred less frequently when he took the medication.

Getch argues that significant medical evidence exists in the record to establish that his gout was a severe medical condition.  Treating physicians Dr. Mahawar, Dr. Daly, and Dr. Rashan diagnosed Getch as suffering from gout.  On January 8, 2003, Dr. Mahawar diagnosed Getch as suffering foot and knee pain with gout.  Dr. Mahawar noted that Getch walked with a mild limp and that his sensation and strength were normal in all extremities.  The ALJ found that the inconsistency in Getch's complaints and Dr. Mahawar's findings diminished Getch's credibility regarding the severity of his gout.  The ALJ deemed Getch's allegations of walking and standing limitations secondary to gout were not supported by the evidence and thus not persuasive on the issue of severity.

On November 18, 2003, Dr. Daly wrote that Getch suffered from tophaceous gout that is very painful most of the time.  On September 24, 2004, Dr. Rashan wrote that Getch suffered from gout with swollen legs and ankles.  The ALJ found the conclusions of Dr. Daly and Dr. Rashan were based on the exaggerated complaints of Getch and that those reports were unreliable as well.

With a clear history of gout diagnosis in his background, Getch claims that the ALJ incorrectly disregarded the diagnoses and found that his gout was not severe.  Reviewing the record, the ALJ considered each of the treating physicians' reports in his decision.  The ALJ gave greater

deference to some reports than others.  In fact, the ALJ gave little or no deference to the diagnoses and evaluation of several treating physicians' descriptions of Getch's gout.  However, the ALJ's decision that Getch's gout did not rise to the level of a severe impairment is supported by substantial evidence in the record.  Specifically, to reach his decision, the ALJ relied on the absence of any mention of gout flare-ups in the doctors' reports and the lack of credibility of Getch's testimony regarding the severity of the gout.  Because the ALJ considered all relevant medical evidence and arrived at a conclusion with the support of substantial evidence, the Court finds that the ALJ did not commit error by failing to find that Getch's gout was a severe condition.

## C.  Weight of treating physician opinions

Getch next argues that the ALJ improperly discredited the testimony of his treating physicians.  A treating physician's opinion is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record.  *See* 20 C.F.R. § 404.152(d)(2); *Boiles*, 395 F.3d at 426 (quoting *Clifford*, 227 F.3d at 870).  "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances."  *Gudgel*, 345 F.3d at 470 (citing *Clifford*, 227 F.3d at 870; 20 C.F.R. § 404.1527(d)(2)).

An ALJ is entitled to discount the medical opinion of a treating physician if it is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as the ALJ is able to "minimally articulate his reasons for crediting or rejecting evidence of disability."  *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Clifford*, 227 F.3d at 871).  An ALJ can reject a treating physician's opinion only for reasons supported by the record, the opinion of a non-treating physician is not alone enough.  *Gudgel*, 345 F.3d at 470 (citing

*Moore v. Barnhart*, 278 F.3d 920,924 (9th Cir. 2002)).   Remand may be appropriate if the ALJ failed to give an adequate explanation of why the treating physician opinion was not entitled to controlling weight.  *See Clifford*, 227 F.3d at 871; *Liscano v. Apfel*, 230 F. Supp. 2d 871, 887-88 (N.D. Ind. 2002).

In examining the evaluations of Getch's treating physicians, the ALJ found their analyses to be substantially unpersuasive.  Five treating physicians' reports are analyzed in the record and the ALJ's decision: Dr. Daly, Getch's family physician; Dr. Rashan, a state physician; Dr. Looyenga; Dr. Angelopoulos; and Dr. Irena Walter, a State mental health professional.  Getch's records were reviewed by four physicians: Dr. Kladder, Dr. Unversaw, Dr. Bastnagel, and Dr. Landwehr.

Dr. Jerome Daly is Getch's family physician who treated Getch on several occasions in connection with the conditions complained of in Getch's DIB application.  Dr. Daly opined that Getch was disabled due to coronary artery disease, nonunion of the sternum, depression, and gout. The ALJ gave Dr. Daly's opinion very little weight because he found that the physical performance of Getch at an examination by Dr. Daly was inconsistent with Dr. Daly's opinion.  Also, the ALJ found that Dr. Daly's records did not cite any treatment records, clinical examination findings, or laboratory findings for support.  Dr. Daly's internal inconsistencies and a failure to cite supporting records provided the ALJ with legitimate reasons to refuse to give Dr. Daly's opinions controlling weight.

Dr. Looyenga also treated Getch.  Upon examination, Dr. Looyenga opined that Getch could walk one city block without rest or severe pain, could walk less than 2 hours during an 8-hour workday, could sit about 4 hours during an 8-hour workday, and could rarely lift less than 10 pounds

and never lift anything over 10 pounds.  In addition, Dr. Looyenga opined that Getch should never twist, stoop, crouch/squat, or climb.  Dr. Looyenga concluded that Getch was a Class IV on the New York Heart Association ("NYHA") cardiac classification scale, which rates patients on an increasing level of heart failure severity ranging from Class I to Class IV.  A Class IV patient, as defined in the ALJ's decision, is described as suffering from "cardiac disease resulting in inability to carry on any physical activity without discomfort.  Symptoms of heart failure or the anginal syndrome may be present even at rest.  If any physical activity is undertaken, discomfort is increased."  R. at 18.

The ALJ disagreed with Dr. Looyenga's finding, concluding that the record did not contain objective evidence of severe heart disease since the alleged onset date.  The ALJ noted that no ischemia was noted on testing, that Getch's complaints were related to his sternum and were not anginal, and that Getch was able to exercise 7 METS without ischemic changes.  The ALJ also cited a letter sent by Dr. Looyenga to Dr. Daly describing Getch's coronary disease as mild to moderate. The ALJ deemed this letter to be inconsistent with Dr. Looyenga's evaluation of Getch as a Class IV.

The ALJ found that at most, Getch was NYHA Class II.  Class II, as defined by the ALJ, is described as "Class II patients with cardiac disease have slight limitation of physical activity.  They are comfortable at rest.  Ordinary physical activities results (sic) in fatigue, palpitation, dyspnea, or anginal pain."  R. at 19.  The ALJ stated that the findings of Dr. Geha, a cardiothoracic surgeon, who saw Getch on November 1, 2001, for a second opinion about surgery on his sternum, supported classifying Getch as a Class II.  Dr. Geha opined that further surgery would not help Getch and he thought that Getch was restricted from lifting heavy weights and should avoid pushing or pulling with his upper extremities.

24

Getch argues that the ALJ concluded that Getch was a Class II patient without the benefit of a supporting physician opinion.  Getch states that the ALJ is not a cardiologist and therefore not qualified to render such an opinion.  An ALJ cannot make independent medical findings.  *See Smith v. Massanari*, No. 00C7652, 2002 WL 480955, *6-7 (N.D. Ill. Mar. 25, 2005) (finding that is was unreasonable for the ALJ to reject the only medical opinion on record regarding a particular health issue and that the ALJ improperly substituted his opinion for that of the medical expert).  However, the point of the ALJ's analysis here was not that Getch was a Class II patient.  It is only that Getch was not a Class IV patient.  In his decision, the ALJ writes, "[a]t most, the evidence supports a finding of class II."  R. at 19.  It is clear in that statement that the ALJ was not rendering a diagnosis or conclusive medical opinion.  Instead, he disagreed with the findings of Dr. Looyenga and gave his reasoning for doing so.  The ALJ conducted an analysis of the classification system that Dr. Looyenga used and stating his own reasons for finding that Getch's presentation did not match the classification given.   Dr. Looyenga's opinion that Getch presented as a Class IV was the only physician finding using this particular rating scale.  The ALJ cannot properly invalidate the sole physician opinion on this particular issue and render an opinion based on his own independent evaluation.  The ALJ did not do so.  The diagnosis of Getch as a Class IV was used by Getch to cite the larger proposition that his heart condition was severe to such a degree that it prevented him from performing past relevant work.  Class IV was not itself conclusive that Getch suffered from a severe medical condition.  While the ALJ's ignorance of Dr. Looyenga's opinion of Getch's cardiac class is improper if the class itself were the basis of the ALJ's diagnosis, the ALJ viewed this particular diagnosis of Dr. Looyenga as a piece of a larger health issue, mainly the severity of Getch's cardiac infarction.  The ALJ's finding that the cardiac infarction was a severe condition but not one that met

25

the medically listed impairments of the Social Security Regulations Appendix found support in the opinion of Dr. Geha, and was thus supported by a treating physician. The Court finds that this analysis did not exceed the ALJ's authority.

The ALJ also disregarded Dr. Looyenga's evaluation of Getch's postural movements. The ALJ found that Dr. Looyenga's medical source statement, which stated that Getch had postural limitations, was based on Getch's exaggerated and unreliable subjective complaints and was inconsistent. Thus, the ALJ did not give it any value. In contrast, the reviewing physicians, Dr. Landwehr and Dr. Bastnagel, opined that Getch could occasionally lift and/or carry 20 pounds and 10 pounds frequently. Overall, the ALJ concluded, the record supports a finding that Getch can lift 20 pounds occasionally and 10 pounds frequently. Getch's credibility and the findings of reviewing physicians Dr. Landwehr and Dr. Bastnagel, lend support to the ALJ's opinion of Getch's postural movement and strength.

Getch also contends that the ALJ should have recontacted Dr. Daly and Dr. Rashan to obtain additional information in support of their findings. While an ALJ is legally required to seek additional information if the ALJ receives evidence from a treating physician that is inadequate for a determination of disability, the ALJ is not required to seek additional information when the evidence provided by a treating physician is sufficient to find that the patient is not disabled. *See* 20 C.F.R. § 404.1512; *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004). Here, after reviewing the records, the ALJ deemed the information submitted by Dr. Daly and Dr. Rashan to be sufficient evidence to determine that Getch was not disabled. Therefore, he was not required to seek additional evidence from Dr. Daly or Dr. Rashan.

In reviewing the findings of Dr. Rashan, an internest hired by the State to examine Getch, the ALJ initially cited to an examination performed by Dr. Rashan in support of his finding.  At the examination, Dr. Rashan noted that Getch had a normal gait, the ability to walk heel to toe, and the ability to tandem walk without difficulty.  Getch was able to stoop and fully squat and had no difficulty with ambulation and finger manipulation.  The ALJ relied on these findings.  Dr. Rashan also noted that Getch suffered from morbid obesity, history of separated sternum, ischemic heart disease, and history of gout.  The ALJ did not note these diagnoses.  Dr. Rashan also made a post-examination statement that Getch could perform no postural movement.  In his decision, the ALJ stated that he found no persuasive evidence in the record that Getch was unable to perform postural movements, disregarding Dr. Rashan's statement.  The ALJ specifically found that Dr. Rashan's statement regarding postural movement was entirely unsubstantiated and extreme.  The ALJ concluded that the reliability of Dr. Rashan's remaining opinions were diminished, including a written report of Dr. Rashan finding that Getch was limited to lifting and carrying less than 10 pounds occasionally or frequently and that Getch's standing and walking was impaired to such a point that Getch could stand and/or walk for less than two hours in an 8-hour day.

The ALJ's reliance and subsequent dismissal of the reliability of Dr. Rashan's opinion is troubling.  "[A]n administrative agency's decision cannot be upheld when the reasoning process employed by the decision maker exhibits deep logical flaws."  *Carradine v. Barnhart*, 360 F.3d 751, 756 (7th Cir. 2004).  An ALJ must provide a sufficient explanation in support of his or her decision to enable a reviewing court to trace the path of their reasoning.  *See Scott*, 297 F.3d at 595.  An ALJ cannot pick and choose among the findings of a treating physician, using only those findings that

support the ALJ's conclusion.  *See Galembiewski v. Barnhart*, 433 F.3d 912, 917 (7th Cir. 2003) (finding that an ALJ "may not ignore an entire line of evidence that is contrary to the ruling").

In the instant case, the ALJ relies on Dr. Rashan's opinion regarding Getch's standing and walking ability but does not rely on Dr. Rashan's evaluations that Getch suffered from morbid obesity, history of separated sternum, ischemic heart disease, and history of gout and lack of postural movement ability.  The ALJ's reliance and subsequent ignorance of Dr. Rashan's findings is inconsistent and improper.  This parsing of a treating physician's findings should be avoided. However, the ALJ was able to overcome this inconsistent use of Dr. Rashan's reports by finding independent support for his conclusions in the findings of reviewing physicians Dr. Landwehr and Dr. Bastnagel and his findings in regard to Getch's credibility.  The objective opinions of Dr. Landwehr and Dr. Bastnagel that Getch was capable of performing his past relevant work and was not disabled support the ALJ's findings, as does the ALJ's finding that Getch was not entirely credible.

Despite disagreeing with most of the treating physicians' findings to some degree, the ALJ did find support for each of his conclusions.  Support came in reports of other physicians, inconsistencies within the physician's conclusions being examined, credibility findings made by the ALJ, and testimony of the VE.  The Court finds that the ALJ's findings in regard to the opinions of Getch's treating physicians are supported by substantial evidence.

### D.  Credibility finding

Getch also seeks remand on the basis that the ALJ made an improper credibility finding when he found Getch's allegations regarding his limitations "not totally credible."  R. at 23.  The Social Security Regulations provide that, in making a disability determination, the Commissioner

will consider a claimant's statement about his or her symptoms, including pain, and how they affect

the claimant's daily life and ability to work.  *See* 20 C.F.R. § 404.1529(a).  However, subjective

allegations of disabling symptoms alone cannot support a finding of disability.  *See id.*  The

Regulations establish a two-part test for determining whether complaints of pain contribute to a

finding of disability: (1) the claimant must provide objective medical evidence of a medically

determinable impairment or combination of impairments that reasonably could be expected to

produce the symptoms alleged; and (2) once an ALJ has found an impairment that reasonably could

cause the symptoms alleged, the ALJ must consider the intensity and persistence of these symptoms.

20 C.F.R. § 404.1529(a).

The ALJ must weigh the claimant's subjective complaints, the relevant objective medical

evidence, and any other evidence of the following factors:

(1)     The individual's daily activities;
(2)     Location, duration, frequency, and intensity of pain or other symptoms;
(3)     Precipitating and aggravating factors;
(4)     Type, dosage, effectiveness, and side effects of any medication;
(5)     Treatment, other than medication, for relief of pain or other symptoms;
(6)     Other measures taken to relieve pain or other symptoms;
(7)     Other factors concerning functional limitations due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).  In making a credibility determination, Social Security Ruling 96-7p

states that the ALJ must consider the record as a whole, including objective medical evidence; the

claimant's statement about symptoms; any statements or other information provided by treating or

examining physicians and other persons about the conditions and how they affect the claimant; and

any other relevant evidence.  *See* SSR 96-7p.

An ALJ is not required to give full credit to every statement of pain made by the claimant

or to find a disability each time a claimant states he or she is unable to work.  *See Rucker v. Chater*,

92 F.3d 492, 496 (7th Cir. 1996).  However, Ruling 96-7p provides that a claimant's statements regarding symptoms or the effect of symptoms on his ability to work "may not be disregarded solely because they are not substantiated by objective evidence."  SSR 96-7p at *6.  An ALJ's credibility determination is entitled to substantial deference by a reviewing court and will not be overturned unless the claimant can show that the finding is "patently wrong."  *Proschaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006).

Getch argues that his testimony was credible because it was supported by substantial medical evidence.  Getch contends that his testimony that he had shortness of breath, could not stand, and could not sleep due to the grinding in his chest was supported by the reports of Dr. Angelopolous, who treated him at the pain clinic, Dr. Geha, Dr. Looyenga, and Dr. Rashan.  The fact that Getch suffered from certain conditions is irrefutable.  The ALJ did not dispute the existence of the conditions complained of or the fact that Getch suffered pain as a result.  To the contrary, the ALJ found that two of Getch's conditions were severe.

The ALJ found that Getch's testimony as to the severity of the effects of his conditions on his physical mobility and ability to conduct himself in his former employment position was not entirely credible.  The ALJ based his conclusion on a review of the medical records, a review of Getch's prescribed medication history, and a subjective examination of Getch's demeanor at the hearing.  The ALJ found that Getch's answers to questions posed at the hearing were vague, indistinct, and careful, which implied that he was searching for responses.  The ALJ determined that Getch's complaints were in excess of what would be reasonably expected from the conditions and procedures Getch had undergone.  The ALJ also found that Getch's allegations of symptoms were inconsistent and therefore unreliable.  The ALJ held that Getch's ability to care for his children and

30

leave the house every day was inconsistent with his claims of physical limitation.  The ALJ did find the evidence supportive of Getch's claims that he is limited in his lifting and carrying ability and ability to sit or stand for long periods of time; however, these limitations were not a disability.

In reaching his credibility finding, the ALJ considered the reports of the treating and reviewing physicians.  For example, the ALJ reasoned, "[t]he claimant mostly complained of sternal pain and that is why he went to a pain management center, but those records do not support the extent of pain alleged now by the claimant.  R. at 19.  The ALJ next wrote, "[t]reatment records from the pain management center reflect that he had a couple of injections in the sternum area that provided pain relief for several months each time.  He also took Celebrex or Bextra, but no narcotic pain medication."  *Id*.

One passage summarizes the ALJ's finding concerning Getch's credibility.  It states, "the claimant has presented with complex and apparently exaggerated complaints of physical emotional distress, and intellectual dysfunction that are inconsistently portrayed in the record.  Accordingly, both the claimant's testimony and the opinion of professionals who have founded their evaluation upon the claimant's reportage are not reliable and cannot be accorded weight for persuasion."  R. at 15.  Based on the foregoing, the Court finds that Getch is unable to establish that the ALJ's credibility finding is patently wrong.

### E.  Obesity and examining the conditions in combination

Getch next contends that the ALJ failed to properly analyze his obesity and failed to consider all of his impairments in combination.  Discussing an ALJ's obligation to examine a claimant's conditions in combination, Social Security Ruling 96-8p states:

> In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe".  While a "not

31

severe" impairment(s) standing alone may not significantly limit an individual's
ability to do basic work activities, it may-when considered with limitations or
restrictions due to other impairments-be critical to the outcome of a claim.

SSR 96-8p.  The Rulings also state that medical conditions that are not severe, when combined, can

produce a severe impairment.  *See* SSR 85-28.

The conditions suffered, as alleged by Getch, are depression, a separated sternum, high

cholesterol, high blood pressure, gout, and obesity.  Getch's gout and separated sternum and their

analyses by the ALJ are discussed in depth *supra*.  With regard to obesity, the record shows that

Getch is approximately 6'3" and weighs over 300 pounds.  Getch argues that the ALJ merely

mentioned his obesity but failed to analyze any effects that the condition had on Getch's other

impairments.  Social Security Ruling 02-1p states that obesity may cause limitations to be greater

because it often leads to, and may complicate, chronic cardiovascular, respiratory, and

musculoskeletal diseases.  SSR 02-1p; *see also Barrett*, 355 F.3d at 1068-69 (finding claimant's

arthritis was not serious itself however when combined with claimant's obesity it made standing for

two hours at a time more painful than it would have been had she only suffered from one condition

or the other).

Getch has a history of variable weight.  On December 21, 1999, on a visit to St. Francis

Health Center for what turned out to be a separated sternum, Getch weighed approximately 230

pounds.  In the approximately five years following that visit, and prior to his hearing before the ALJ,

Getch gained approximately 100 pounds.  In a written report, Dr. Rashan diagnosed Getch as

suffering from morbid obesity.

The ALJ makes little direct mention of Getch's weight in the decision other than stating,

"[t]he claimant has gained weight since his bypass surgery and now weights about 324 pounds at

32

6 feet, 3 inches tall.  He has poor exercise tolerance."  R. at 19.  The ALJ also briefly noted that Dr. Looyenga diagnosed Getch as obese.  Aside from these passing mentions, weight is considered as a secondary impairment in the decision, such as where the ALJ wrote that "[t]he evidence supports a finding that the claimant . . . must alternate sitting and standing . . . secondary to some fatigue and shortness of breath with heavy exertion."  R. at 17.  The ALJ impliedly held that Getch's weight is a secondary condition affecting his postural movement, ability to sit and stand, range of motion, and strength.

Getch also contends that he suffered from depression, which contributed to his alleged disability.  With regard to Getch's mental health, the ALJ found that there were no limitations because Getch's depression and anxiety were not severe for the preceding 12 months.  The ALJ also found that Getch's complaints of mental impairment limitations were not supported by the record.  The ALJ noted that since the alleged disability onset date, Getch was not treated by any mental health professional, was not prescribed medication for depression, and did not seek counseling.

Dr. Daly and Dr. Walters diagnosed Getch as suffering from depression.  The ALJ noted that Dr. Daly diagnosed depression but did not prescribe any medication or refer Getch to a mental health professional.  Irena Walters, Psy.D., in one psychological exam of Getch, diagnosed him as suffering from severe depression and/or anxiety.  Dr. Walters rated Getch a 55 out of a possible 100 on the GAF scale.  The ALJ concluded that Dr. Walters rated Getch too low on the psychological examination.  The ALJ stated that an apparent simple complaint of sadness resulted in Dr. Walter's diagnosis.  The ALJ reasoned that even if Getch was severely depressed when he saw Dr. Walters, the record does not establish that his symptoms were present for the 12 consecutive month durational requirement of a severe impairment.

33

The ALJ agreed with the reviewing State Agency psychologists who found that Getch's mental impairments were not severe because they caused no more than mild functional limitations. The State Agency psychologists, Dr. Kladder and Dr. Unversaw, noted that there was no history of mental health treatment and that the reported symptoms were mild. The ALJ concluded that Getch's depression and anxiety, alone or in combination, did not cause a severe impairment. The ALJ interpreted Getch's ability to manage his household, function socially, and perform routine daily activities like reading, watching television, and using the Internet as an indicator of Getch's psychological well being. The ALJ also found that Getch's mental impairments caused no more than a minor difficulty in his psychological capacity for work.

Getch does not specifically address his alleged high cholesterol or high blood pressure in his brief requesting remand. The ALJ likewise makes little mention of these conditions. In one of the initial sections of the ALJ's decision, he mentions that Getch alleged that he is disabled due to a list of conditions, including hypertension. The ALJ later acknowledges that Dr. Looyenga diagnosed Getch as suffering from hypertension and elevated cholesterol, among other diagnoses. The ALJ makes no further direct mention of cholesterol or hypertension. Like obesity, high cholesterol and high blood pressure are impliedly considered by the ALJ to be secondary impairments. The fact that the ALJ did not specifically address Getch's high cholesterol and high blood pressure does not mean that he did not consider them in combination with Getch's primary impairments.

Setting up his analysis, the ALJ commented, "all medically determinable impairments must be considered in the remaining steps of the sequential analysis." R. at 14. Discussing Getch's impairments in combination, the ALJ specifically found that Getch's impairments were "not 'severe' enough to meet or medically equal, either singly or in combination to one of the impairments listed

34

in Appendix 1, Subpart P, Regulations No. 4." *Id.* This reasoning is sufficient to meet the ALJ's required burden of considering impairments in combination. *See Corey v. Barnhart*, IP 01-0320-C-T/F, 2002 WL 663130 at *4 (S.D. Ind. Mar. 14. 2002) ("Though the use of words such as 'combination of impairments' or 'combined effect of impairments' may not be mandatory, use of these or similar words would clearly reflect that the ALJ considered Corey's impairments in combination"). The ALJ expressly and impliedly considered Getch's impairments in combination. The Court therefore finds that the ALJ properly considered Getch's multiple impairments in combination.

### F. Appeals Council finding regarding value of treating physicians' reports

Getch contends that the Appeals Council committed an error of law by failing to reverse the ALJ's findings that gout was not a severe impairment and that Getch had questionable credibility in his assertions of gout and its effects. In describing cases subject to Appeals Council review, the Social Security Regulations provide that:

> If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision.

20 C.F.R. 416.1470(b). "New evidence is material if for purposes of 42 U.S.C. § 405(g) there is a 'reasonable possibility' that it would change the outcome." *Nelson v. Bowen*, 855 F.2d 503, 506 (7th Cir. 1988) (citing *Godsey v. Bowen*, 832 F.2d 443, 444 (7th Cir. 1987)). The Court undertakes *de novo* review of whether the Appeals Council was correct in finding that evidence is new, material, and related to the period on or before the date of the ALJ's decision. *See Nelson*, 855 F.2d at 506; *Alexander v. Barnhart*, No. 01 C 0168, 2003 WL 21418244, *8 (N.D. Ill. June 18, 2003). Absent

some legal error in the Appeals Council's analysis, the decision to deny review is discretionary and unreviewable.  *See Perkins v. Chater*, 107 F.3d 1290, 1294 (7th Cir. 1997).

Getch argues that records submitted by Dr. Eswaramoorthy after the ALJ's decision should have led the Appeals Council to reverse the ALJ's findings that Getch's gout was not a severe condition and that Getch was not credible.  Between December 2004 and September 2005, Dr. Eswaramoorthy, a treating physician, repeatedly diagnosed Getch as suffering from acute gout attacks and/or recurrent gout. The Appeals Council found that the information contained in Dr. Eswaramoorthy's reports did not provide a basis for reviewing the ALJ's decision.  The Appeals Council did not enumerate the reasons for its decision to deny review other than stating, "we considered the reasons you disagree with the decision."  R. at 4.

The Court finds that the Appeals Council was not required to review Dr. Eswamoorthy's subsequent reports because they involved dates of treatment after Getch's August 19, 2004 hearing before the ALJ, which was the relevant date of Getch's health.  Thus, because the new evidence describes the condition of Getch after his hearing before the ALJ, the Appeals Council did not commit legal error in refusing to remand the case based on that evidence.

## CONCLUSION

Based on the foregoing, the Court finds the ALJ's determination to be supported by substantial evidence.  Therefore, the Court **DENIES** the Motion for Summary Judgment [DE 11]. The Court **REAFFIRMS** the ALJ's decision in all respects.

SO ORDERED this 15th day of May, 2007.

/s Paul R. Cherry                              
MAGISTRATE JUDGE PAUL R. CHERRY

36

UNITED STATES DISTRICT COURT

cc: All counsel of record